# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALISA A. MARTINEZ, | ) 1:08-cv-01138-GSA |
| | ) |
| Plaintiff, | ) DECISION AND ORDER DENYING |
| v. | ) PLAINTIFF'S SOCIAL SECURITY |
| | ) COMPLAINT (DOC. 1) |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF SOCIAL | ) ORDER DIRECTING THE ENTRY OF |
| SECURITY, | ) JUDGMENT FOR DEFENDANT MICHAEL J. |
| | ) ASTRUE, COMMISSIONER OF SOCIAL |
| Defendant. | ) SECURITY, AND AGAINST PLAINTIFF |
| | ) ALISA A. MARTINEZ |
| | ) |

Plaintiff is proceeding in forma pauperis and with counsel with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's applications of September 24, 2004, and November 4, 2004, made pursuant to Titles II and XVI of the Social Security Act, for Supplemental Security Income (SSI) benefits and Disability Insurance benefits (DIB), in which she alleged that she had been disabled since December 31, 2002, due to bipolar condition and depression; Plaintiff later requested a closed period of disability from December 31, 2002, through September 28, 2005. (A.R. 15, 94-95, 97-98, 326-28.) The parties have consented to the jurisdiction of the United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c)(1), and pursuant to the order of Judge Lawrence J. O'Neill filed on November 3, 2008, the matter has been assigned to the Magistrate Judge to conduct all further proceedings in this case, including the entry of final judgment.

The decision under review is that of Social Security Administration (SSA) Administrative Law Judge (ALJ) Richard A. Say, dated March 22, 2008 (A.R. 15-27), rendered after a video hearing held on February 22, 2008,[1] at which Plaintiff appeared by video and testified with the assistance of an attorney representative. A vocational expert (VE) also testified. (A.R. 15, 348-70.)

The Appeals Council denied Plaintiff's request for review of the ALJ's decision on June 10, 2008 (A.R. 5-7), and thereafter Plaintiff filed the complaint in this Court on August 4, 2008. Briefing commenced on June 12, 2009, and was completed with the filing of Plaintiff's reply brief on September 18, 2009. The matter has been submitted without oral argument to the Magistrate Judge.

I. Jurisdiction

This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), which provide that an applicant suffering an adverse final determination of the Commissioner of Social Security with respect to disability or SSI benefits after a hearing may obtain judicial review by initiating a civil action in the district court within sixty days of the mailing of the

_____

[1] Plaintiff's failure to appear at an earlier hearing was found to have been with good cause. (A.R. 15, 70-71, 342-47.)

2

notice of decision. Plaintiff timely filed her complaint on
August 4, 2008, less than sixty days after the mailing of the
notice of decision on or about June 10, 2008.

II. <u>Standard and Scope of Review</u>

Congress has provided a limited scope of judicial review of
the Commissioner's decision to deny benefits under the Act. In
reviewing findings of fact with respect to such determinations,
the Court must determine whether the decision of the Commissioner
is supported by substantial evidence. 42 U.S.C. § 405(g).
Substantial evidence means "more than a mere scintilla,"
<u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971), but less than a
preponderance, <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119, n. 10
(9th Cir. 1975). It is "such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion."
<u>Richardson</u>, 402 U.S. at 401. The Court must consider the record
as a whole, weighing both the evidence that supports and the
evidence that detracts from the Commissioner's conclusion; it may
not simply isolate a portion of evidence that supports the
decision. <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir.
2006); <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).
It is immaterial that the evidence would support a finding
contrary to that reached by the Commissioner; the determination
of the Commissioner as to a factual matter will stand if
supported by substantial evidence because it is the
Commissioner's job, and not the Court's, to resolve conflicts in
the evidence. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 (9th
Cir. 1975).

In weighing the evidence and making findings, the

3

Commissioner must apply the proper legal standards. Burkhart v.
Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must
review the whole record and uphold the Commissioner's
determination that the claimant is not disabled if the
Commissioner applied the proper legal standards, and if the
Commissioner's findings are supported by substantial evidence.
See, Sanchez v. Secretary of Health and Human Services, 812 F.2d
509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If
the Court concludes that the ALJ did not use the proper legal
standard, the matter will be remanded to permit application of
the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th
Cir. 1987).

III. Disability

A. Legal Standards

In order to qualify for benefits, a claimant must establish
that she is unable to engage in substantial gainful activity due
to a medically determinable physical or mental impairment which
has lasted or can be expected to last for a continuous period of
not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).
A claimant must demonstrate a physical or mental impairment of
such severity that the claimant is not only unable to do the
claimant's previous work, but cannot, considering age, education,
and work experience, engage in any other kind of substantial
gainful work which exists in the national economy. 42 U.S.C.
1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th
Cir. 1989). The burden of establishing a disability is initially
on the claimant, who must prove that the claimant is unable to
return to his or her former type of work; the burden then shifts

4

to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520;[2] 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

With respect to SSI, the five-step evaluation process is essentially the same. <u>See</u> 20 C.F.R. § 416.920.

---

[2] All references are to the 2008 version of the Code of Federal Regulations unless otherwise noted.

5

## B. The ALJ's Findings

The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2007. (A.R. 17.)

The ALJ found that Plaintiff had the severe impairment of depression, but Plaintiff's alleged personality disorder, post-traumatic stress disorder (PTSD), bipolar disorder, and amphetamine-induced psychotic disorder were not severe medically determinable impairments because they did not endure for the required continuous, twelve-month period. (A.R. 19-20.) Plaintiff had no impairment or combination thereof that met or medically equaled a listed impairment. (A.R. 20.) Plaintiff had no exertional limitations and could perform at least a full range of medium exertion level activities with non-exertional limitations of understanding, remembering, and carrying out only simple, routine tasks; having only superficial contact with the public and with only a few co-workers; and working with, independently of, but not in direct cooperation with, her co-workers. (A.R. 20-25.) Plaintiff could not perform her past relevant work as an administrative assistant or clerk, but because she was a younger individual with a high school education and ability to communicate in English, and considering her residual functional capacity (RFC) and work experience, there were jobs that existed in significant numbers in the national economy, including assembly worker, production inspector, and checker. (A.R. 25-26.) Accordingly, Plaintiff was not disabled at any time from the alleged date of onset of December 31, 2002, through March 22, 2008, the date of decision. (A.R. 27.)

C. <u>Plaintiff's Contentions</u>

Plaintiff argues that at step two, the ALJ failed to apply legally correct standards and engaged in improper analysis of the severity of Plaintiff's PTSD and bipolar disorder by finding that they had not been shown to have existed for the requisite duration. Plaintiff argues that because the ALJ considered those conditions to have been the product of drug use, the ALJ's analysis ran afoul of the holding in <u>Bustamante v. Massanari</u>, 262 F.3d 949, 954-55 (9th Cir. 2001), which precludes application at step two of 20 C.F.R. §§ 404.1535(a), 416.935(a), relating to whether or not drug addiction or alcoholism contributed to a disability.

With respect to step four of the sequential analysis and the formulation of Plaintiff's RFC, Plaintiff argues 1) the ALJ failed to state clear and convincing reasons for rejecting Plaintiff's testimony concerning her subjective complaints; 2) the ALJ failed to state specific, germane reasons for rejecting the testimony of Plaintiff's mother and stepfather concerning Plaintiff's limited attention and concentration; and 3) the ALJ failed adequately to explain the weight he gave to the opinion of state agency psychiatrist Gene Kester, M.D., and for rejecting Dr. Kester's limitations, which Plaintiff argues would preclude employment as demonstrated by the vocational expert's testimony.

Plaintiff contends that at step five of the sequential analysis, the Commissioner's conclusion that jobs were available was not supported by substantial evidence because the hypothetical question propounded to the VE was incomplete due to its omission of an adequate reference to Plaintiff's deficits in

attention and concentration.

IV. <u>The Medical Evidence</u>

From December 2, 2003, through December 5, 2003, Plaintiff was hospitalized at the Stanislaus Behavioral Health Center (SBHC) of the Stanislaus County Department of Mental Health, where Plaintiff was transferred after police had taken her to a hospital for exhibiting psychotic symptoms, including making a 911 call because she believed she was being pursued by people who had attached a bomb to her car. (A.R. 159-90, 159, 187.) Plaintiff reported that for two months she had not taken the medications she took for her mental illness; she then denied being mentally ill or having been medicated, which her ex-husband confirmed, but she reported that she had used amphetamine that previous night. (A.R. 159, 187.) Her blood tested positive for amphetamine (A.R. 189), but she "was unable" to provide information regarding the frequency and extent of her drug use (A.R. 188). Upon admission, the diagnosis was psychotic disorder, not otherwise specified, amphetamine abuse, with diagnosis on Axis II deferred, and a global assessment of functioning (GAF) of 30. (A.R. 187.) Plaintiff believed that neighbors had stolen significant sums from her, but there were no hallucinations; memory and concentration were intact, intellect was average, and insight and judgment were poor. (A.R. 188.) Upon discharge, she was alert, oriented, talkative, very cooperative, and exhibited no confusion, disorientation, psychosis, depression, or suicidal, homicidal, or violent behavior; she did not need any more evaluation of medication. (A.R. 190.) The diagnosis at discharge was substance-induced mood disorder, poly-substance dependence;

personality disorder, not otherwise specified; with a GAF of 65. (Id.) Medications for various infections were prescribed. (A.R. 189.)

Plaintiff was hospitalized as a result of bronchitis and an allergic reaction to medication in the middle of December 2003. (A.R. 191-231, 197, 202, 216, 219.)

On July 11, 2004, Plaintiff visited the emergency room of Doctors Medical Center for family stress, crying, and multiple somatic complaints. (A.R. 232-47.) The impression was acute and chronic depression. (A.R. 234.) Plaintiff drove herself to the SBHC, where Plaintiff was admitted and then discharged on July 13, 2004. Plaintiff was confused, poorly groomed, and disorganized, and she asserted that her twelve-year-old son had been stolen. She was described as highly driven, grandiose, psychotic, labile, and pressured, as well as delusional about having been harassed. (Id., 239, 244-45.) It was stated that her urine drug screen was negative (A. R. 244), but it was also noted that she refused urine for urine toxicology and urinalysis tests (A.R. 246). Plaintiff related a history of cocaine abuse without use in sixteen years, and a history of alcohol dependence and a DUI, but she said she last drank in April 2004. (A.R. 245.) It was noted on discharge that her behavior was highly driven and very impulsive with very broad gesturing and constant fidgeting; her manner was cooperative, but she refused medication; her insight and judgment were grossly impaired. Her mood was irritable and dysphoric with a labile affect; her thought process was tangential at best, with content centered about her delusions and often loose with pressured speech that was overly loud and

9

emphatic. (A.R. 245-46.) However, it was also noted that by the date of discharge, Plaintiff's mood and affect improved, her thought processes were more organized, her mood stable and less anxious, no agitation or distressed behaviors were observed, and insight and judgment as well as coping skills for stressors were better. Her condition was stable to be discharged from the inpatient unit. No medications were prescribed, but Plaintiff was to follow up with services. (A.R. 246.)

In the discharge summary, Tomonori Fukui, M.D., stated that the diagnosis upon admission was bipolar I disorder, most recent episode mixed, severe, with psychotic features, and history of poly-substance dependence; diagnosis on Axis II was deferred; and the GAF was 30. (A.R. 244, 247.) The diagnosis on discharge was adjustment disorder, not otherwise specified, possible brief psychotic disorder, and past history of poly-substance dependence, with diagnosis on Axis II deferred, and a GAF of 56. (Id. at 244.)

On September 23, 2004, Sandy Birdlebough, Ph.D., A.R.N.P., evaluated Plaintiff on a "crisis psych eval slot" after Plaintiff had contact with Acute Care. (A.R. 249-52, 274.) Plaintiff reported three prior admissions to SBHC for evaluation and some outpatient counseling for depression, but she had never been on any medications. She cared for her five-year-old daughter, who had undergone five open-heart surgeries. Plaintiff's speech was rapid, her ideation was somewhat paranoid and grandiose, and her thoughts were scattered and yet logical. Plaintiff reported poor sleep and appetite. She exhibited intact long-term and short-term memory (although scattered thoughts made it difficult to tell at

times), above-average intellect, and poor judgment; she could do simple calculations but had some difficulty concentrating. (A.R. 250-51.) Dr. Birdlebough's impression was that Plaintiff had been fairly high functioning up until losing her job in December 2003 and losing her son. She appeared to be quite manic and probably had been "prodromally manic" for the last several years, channeling all her energy into caring for a child born with cardiac anomalies. (A.R. 251.) The diagnosis was bipolar disorder, not otherwise specified--provisional diagnosis; diagnosis deferred on Axis II; and the GAF was 42. Plaintiff agreed to take medication and was given Abilify, with instructions to return in one week for follow-up. (A.R. 251.)

On September 29, 2004, Dr. Birdlebough noted some lessening of symptoms with less grandiosity and pressured speech; Abilify was continued, and Lamictal was started. (A.R. 275.) Zoloft was the subject of a consent form for depression medication in late October 2004. (A.R. 278.)

In November 2004, Plaintiff reported to Yvana Iovino, M.D., and Nicolae Oprescu, M.D., at the Yakima Valley Farmworkers Clinic, that she was doing well, felt better after having started treatment, had no significant complaints, and would like to go back to school to go into nursing. Her medications included Zoloft, Lamictal, and Abilify; Dr. Oprescu noted that her bipolar disorder was apparently under control on multiple medicines. (A.R. 254-56.)

In December 2004, Plaintiff attended group therapy twice. (A.R. 281-82.) Dr. Birdlebough's progress note for December 29, 2004, stated that Plaintiff was doing well on current medications

with the only side-effect being some daytime drowsiness; moods were stable; and she slept well, had no thoughts of self-harm, and had no abnormal movements or complaints of stiffness. She was "stable on current meds with good mood and sleep." (A.R. 283.)

On January 5, 2005, Dr. Birdlebough reported that Plaintiff had shown marked improvement in all areas, including affect, concentration, memory, and overall functioning, since beginning medication. She had also gained insight into the importance of being on medication; she was sharing childcare and household duties with her mother. The prognosis was good as long as Plaintiff continued her medication and counseling. (A.R. 252.)

On January 5, 2005, state agency consultant Gene Kester, M.D., completed a mental functional capacity assessment covering July 2004 to the date of reporting, as well as a psychiatric review technique. (A.R. 305-307, 308-21.) In the technique, Dr. Kester concluded that an RFC assessment was necessary with respect to Plaintiff's affective disorder, specifically, bipolar I disorder. (A.R. 308, 311.) In part III of the technique, entitled "RATING OF FUNCTIONAL LIMITATIONS," and with respect to the "B" criteria, Dr. Kester assessed mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (A.R. 318.) Dr. Kester concluded that Plaintiff was moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, and interact appropriately with the general public. (A.R. 305-07.) With

respect to understanding and memory, Plaintiff exhibited no
significant impairment of memory even when in a hypomanic state.
With respect to sustained concentration and persistence, she had
somewhat limited concentration but could carry out routine tasks
on a routine, daily basis. She might be distracted by excess
stimulation until further stabilized on medications, and she
would work best with a limited number of coworkers, performing
relatively independent tasks; however, she could persist
throughout a daily/weekly schedule. With respect to social
interaction, she might have superficial contact with the public.
As to adaptation, she could travel, plan, avoid hazards, and
adapt to routine changes; she was intelligent and had a good work
history before her illness. (A.R. 307.)

Plaintiff experienced symptoms of near-syncope in January
2005 that were treated with Propranolol. (A.R. 258.) Plaintiff
attended another group therapy session and completed her goal-
setting group on January 24, 2005. (A.R. 284, 288.)

For Plaintiff's experiences of near-syncope, Clonazepam was
prescribed in March 2005 on the assumption that the symptoms
might be consistent with panic attacks, although there was a very
low possibility of arrhythmias. (A.R. 258, 261.) Plaintiff began
individual therapy on March 17, 2005, with Joyce Ruff-Delgado,
M.S., L.M.H.C., therapist. Plaintiff was given information on
bipolar disorder. (A.R. 289.)

On March 30, 2005, Rodolfo Trivisonno, M.D., reported a
change in the diagnosis to post-traumatic stress disorder,
neurotic depression, bipolar by history, amphetamine abuse in
current early remission, amphetamine-induced psychotic disorder

in remission, with diagnosis deferred on Axis II; the GAF was 60. (A.R. 291.) The plan was to prevent substance abuse relapse, control panic and psychotic symptoms, and continue with medications. (A.R. 291.) On April 18, 2005, at a case staffing meeting, the diagnosis of PTSD was reiterated. (A.R. 293.) However, therapist Ruff-Delgado recorded a bipolar diagnosis on April 19, 2005, noted Plaintiff's scores on "self-tests," including 7/12 and 18/27 on depression, 16/19 on PTSD, and 11/16 on anxiety, and further characterized the results on the OCD self-test as endorsing contamination, hoarding, symmetry, aggressive, and religious cleaning/washing compulsions. It was noted that Plaintiff reported many symptoms associated with possible diabetes, and she admitted that her diet was filled with sugar, caffeine, and carbohydrates. Plaintiff also reported that she had applied and interviewed for several positions recently and was hoping to be called soon. (A.R. 294.)

On April 20, 2005, Dr. Trivisonno reiterated his changed diagnosis of PTSD, etc., and noted that Plaintiff was oriented, calmer, less depressed, and reported no psychotic symptoms and good sleep with mild daytime sedation but no other side-effects. She was cognitively improved. The GAF was 65. (A.R. 295.) Dr. Trivisonno discontinued the Abilify because of an absence of psychotic symptoms, and continued Lamictal for mood stabilization, Zoloft for depression, and Clonazepam for anxiety and insomnia. (Id.) Plaintiff was encouraged to develop realistic expectations and to continue with therapy and relapse prevention. (A.R. 295.)

In May 2005, Dr. Trivisonno reiterated his diagnosis without

change, assessed Plaintiff's GAF as 70, and noted that Plaintiff was oriented, calmer, cooperative, well-groomed, with an affect reflecting that she was feeling better; she was cognitively improved and suffered no psychotic symptoms or mania. Medications and education were continued. (A.R. 298.) On May 26, 2005, in a visit for medication management, Dr. Trivisonno diagnosed PTSD, chronic; neurotic depression; amphetamine abuse; and amphetamine-induced psychotic disorder in remission, with no diagnosis on Axis II; the GAF was 70. (A.R. 299.) Plaintiff was alert, fully oriented, calm and cooperative, well groomed, and with a stable mood reflecting that she felt better. She reported sleep disturbed by worries concerning a custody battle with her ex-husband and by her depression over marital abuse that triggered her substance abuse. She was cognitively improved, with no psychotic symptoms and no mania. Medications and education were continued. (A.R. 299.)

In July 2005, Plaintiff was transferred to a new case manager, who noted continuing problems with depression stemming from her problems with children and prior relationships. The diagnosis remained PTSD. (A.R. 302.) Plaintiff failed to appear for case and medication management appointments in the late spring and summer of 2005. (A.R. 296-97, 303-04.)

On August 24, 2005, state agency medical consultant James E. Bailey, Ph.D., reviewed all the evidence in the file and Dr. Kester's assessment of January 5, 2005, and affirmed Dr. Kester's assessment. (A.R. 307, 318.)

V. <u>Plaintiff's Testimony</u>

At the hearing held on February 22, 2008, Plaintiff

testified that she was forty-one years old, a high school graduate, and unmarried; she did in-home health support services for 32.2 hours for her own daughter, and that activity had been ongoing since 1999. (A.R. 352-53, 362-63.) Further, she worked the Christmas season briefly for Toys R Us in 2005. (A.R. 352.) Plaintiff lived with her two children, aged six and eight. She could read and understand newspaper articles, write notes and letters to people, and figure out what change she should receive at the store when buying something. (A.R. 354.) She lost her job in 2002, was first hospitalized in December 2003, was hospitalized the second time in 2004, and last used drugs in 2005. (A.R. 357-58.) She testified that she was not using amphetamines at the time of alleged onset (December 31, 2002), but she also admitted that reports about amphetamine abuse were not incorrect. (A.R. 355.) Before she lost her job she was in counseling. (A.R. 358.) She could not have held down a forty-hour a week job from 2002 through 2005 because she was very emotional; she needed to take care of her daughter, lost her income, her child's father lost his income, and Plaintiff had to sell her home. (A.R. 361.)

VI. <u>Lay Evidence</u>

Plaintiff's mother completed an adult function report on November 19, 2004 (A.R. 123-31), in which she reported spending ten hours a day with Plaintiff, with whom she cooked and completed normal activities. Plaintiff needed to be reminded about doctor's appointments for herself and the children and to take her medicine every day. Plaintiff prepared simple meals and did cleaning and laundry, but Plaintiff had no energy; she hardly

16

ever went out except to feed the dogs. She walked and drove a car but did not go out alone. She shopped monthly at the grocery store; she had a problem concentrating and used cash. She walked the kids and dogs with others weekly, went to the park, and had no problems getting along with family, friends, neighbors, or others. Plaintiff was irritable; she had a problem remembering things she was supposed to do and could not concentrate on paperwork. She could not pay attention for too long and did not finish what she started. She could follow written and spoken instructions very well, and got along well with bosses and teachers, but not others. She had never been fired, did not handle stress or changes in routine very well at all, and was unusually afraid of being alone. (A.R. 123-31.)

Plaintiff's stepfather, Raymond R. Ortiz, completed an adult function report on November 19, 2004, based on his having known Plaintiff for thirteen years and talking with her. (A.R. 132-40.) Plaintiff prepared breakfast for the children, clothed them, bathed then at night, and took care of animals. She could no longer work, do her finances, and take care of the home; her sleep was interrupted at night, and she slept off and on during the day. Plaintiff needed to be reminded to take her medicine. She made simple meals a couple of times a week, lacked energy, could do laundry and clean her room and the living room, but she sometimes forgot to finish. She did not go out much and never went out without someone with her; she shopped at the grocery store monthly, and using a checkbook confused her, but her ability to handle money had not changed. She walked the dogs and walked with the children, went to the park, and had no problems

getting along with others. Her memory and concentration were affected; she forgot and could not concentrate; she could pay attention very little and did not get along with police or landlords. She could not handle stress and did not handle changes in routine well. She did not want to be alone going places. (Id.)

VII. Vocational Expert's Testimony

Daniel McKinney, a vocational expert, testified that he had studied the vocational materials in the record; Plaintiff's past relevant work as an administrative clerk was light, semi-skilled work pursuant to the Dictionary of Occupational Titles (DOT). (A.R. 364-65.)

McKinney testified that an individual who was forty-one years old, with a high school education, the ability to read, write, and use numbers, and Plaintiff's work history, and who could perform at least medium exertional work, with some mental impairments such that she was capable of understanding, remembering, and carrying out simple, routine tasks, should have only superficial interaction with the public and coworkers, and probably be limited to working with only a few coworkers and working relatively independently but not cooperatively with others, could not perform Plaintiff's past, semi-skilled work. (A.R. 365.) However, such a person could probably perform unskilled occupations, typically in a production environment, such as assembly, with 16,000 jobs consistent with the hypothetical in the tri-state region of Washington, Oregon, and Idaho at sedentary and light, and some expansion of that for medium, and 600,000 in the national economy at sedentary and light. (A.R. 365-66.) The DOT job titles in that category were

electronics workers, DOT number 726.687-010, and small products assemblers, DOT number 739.687-030. (A.R. 366.)

McKinney continued his response to the initial question, stating that a second category of jobs would be production inspectors and checkers, with approximately 4,000 jobs consistent with the hypothetical in the tri-state region, and approximately 140,000 in the national economy, with job title examples from that prior category including inspector of small parts and products, DOT number 733.687-042, and weld inspector, DOT number 724.685-014. (A.R. 366.)

When asked if those jobs were consistent with the DOT, the VE replied affirmatively. (A.R. 366.)

The ALJ posed another hypothetical based on the "testimony today." (A.R. 366-67.) He directed the VE to assume that the testimony was consistent with medical evidence in the record, and asked if such an individual would be able to perform any of Plaintiff's past work. The VE responded in the negative because of the distractibility, inability to focus, and level of dysfunction that she described. (A.R. 367.)

Plaintiff's counsel posed another hypothetical, positing an individual with Plaintiff's age, education, past relevant work experience, with "significant interference in" their ability to maintain attention and concentration for extended periods and a "significant interference with" their ability to carry out detailed instructions, a "significant interference" with their ability to work in coordination with or proximity to others without being distracted by them, and a "significant interference" in their ability to interact appropriately with the

general public. (A.R. 367.) The ALJ stated that "we should define what a significant interference is." (A.R. 368.) The following colloquy occurred:

> ATTY: Yeah. I just say just use the dictionary definition or the vocational definition of how significant interference with basic daily ac – basic work activities in those areas.
>
> ALJ: Are those limits off of any of these forms in the file or?
>
> BY ATTORNEY:
> Q. Yes. They're off of 12F, Your Honor. And significant interference is off of the Social Security Regulations and Rulings that say a moderate limitation is a severe impairment, and severe is defined as, you know, significant interference.
>
> A In my opinion, a person with that profile would not be able to maintain competitive employment.

(A.R. 368.)

## VII. The ALJ's Analysis of the Severity of Plaintiff's Impairments

### A. Legal Standards

At step two, the Commissioner considers if claimant has "an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). This is referred to as the "severity" requirement and does not involve consideration of the claimant's age, education, or work experience. Id. The step-two inquiry is a de minimis screening device to dispose of groundless claims. Bowen v. Yuckert, 482 U.S. 153-54 (1987). The Secretary is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of [sufficient medical] severity." 42 U.S.C. § 1382c(a)(3)(F).

Basic work activities include the abilities and aptitudes necessary to do most jobs, such as physical functions of walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

An impairment or combination thereof is not severe when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work. An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a); Soc. Sec. Ruling 85-28; Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996).

An impairment must last or be expected to last at least twelve continuous months. 20 C.F.R. §§ 404.1509, 416.909. Further, the inability to work caused by the impairment must last at least twelve continuous months. Barnhart v. Walton, 535 U.S. 212, 214-22 (2002).

B. The ALJ's Findings at Step Two

The ALJ concluded that Plaintiff's depressive disorder was Plaintiff's only severe, medically determinable impairment. (A.R. 20.) He reasoned:

The claimant's alleged personality disorder, post traumatic stress disorder (PTSD), bipolar disorder and amphetamine-induced psychotic disorder are not

21

severe medically determinable impairments as defined in the Social Security Act. Those conditions were of a relatively short duration, lasting less than the required 12 months continuous period, and they were no longer present after the claimant stopped the use of amphetamines. The claimant's alleged manic symptoms were later denied by the claimant once she was started taking medications and she stopped taking crank and amphetamines, leaving only some depressive symptoms. The claimant's allegations of former spousal abuse and likely post traumatic stress disorder symptoms were not indicated in the record to be continuing and they are not well substantiated in the record.

There are no quantitative psychological test results in the record, other than clinical interview reports and a hospitalization for substance-induced mood disorder, indicating any treatment for any mental impairments prior to September 2004 and none after May 2005. However, looking at the evidence in the light most favorable tot he claimant, the undersigned finds the claimant to have a severe medically determinable impairment of a depressive disorder but no other finding of any other severe medically determinable physical or mental impairment.

(A.R. 20.)

C. Analysis

The ALJ's conclusion that any personality disorder and amphetamine-induced psychotic disorder and their effects did not endure for the necessary twelve-month period is supported by substantial evidence. Plaintiff experienced a single episode of extreme symptoms that endured at most for several days, and this prompted the diagnosis; however, the symptoms quickly ceased when the drug use ceased. The diagnosis was not repeated except to be noted as being in a state of remission.

With respect to the bipolar disorder, a diagnosis of bipolar disorder appeared on Plaintiff's hospital visit in July 2004, but upon discharge it had been revised to adjustment disorder, not otherwise specified. It was Dr. Birdlebough who provisionally diagnosed bipolar disorder in September 2004, and began giving

Plaintiff medication for it. However, she treated Plaintiff for multiple conditions, including depression. By March 2005, Dr. Trivisonno had changed the diagnosis to PTSD, depression, and amphetamine-induced psychotic disorder; Plaintiff's treatment was modified to eliminate medicines for psychotic symptoms, but to continue treatment for depression and for mood stabilization.

The record also supports the ALJ's finding that Plaintiff had denied having continuing manic-type symptoms, and that depressive symptoms remained.

Thus, substantial evidence supported the ALJ's conclusion that any bipolar disorder and its effects did not endure for the requisite twelve-month period.

As to Plaintiff's PTSD, Dr. Trevisonno's diagnosis came in March 2005. The record thus supports the ALJ's finding concerning the duration of Plaintiff's PTSD. As the ALJ specifically noted, there were no quantitative psychological tests results in the record indicating treatment for mental impairments before September 2004 or after May 2005. Likewise, as the ALJ noted, there were only limited references to Plaintiff's alleged former spousal abuse.

The Court therefore concludes that the ALJ's analysis of the severity of Plaintiff's mental impairments proceeded according to correct legal standards and was supported by substantial evidence.

D. <u>Consideration of Drug Abuse</u>

It is within this context that the Court addresses Plaintiff's contention that the ALJ erred in considering Plaintiff's non-severe impairments to have been the product of

23

drug use. Plaintiff relies on <u>Bustamante v. Massanari</u>, 262 F.3d 949, 954-55 (9th Cir. 2001), which precludes application at step two of 20 C.F.R. §§ 404.1535(a), 416.935(a), relating to whether or not drug addiction or alcoholism contributed to a disability. These regulations relate to statutory provisions which render a claimant ineligible for SSI or DIB if drug and/or alcohol abuse are a material factor in a finding of disability. The court in <u>Bustamante v. Massanari</u> addressed the appropriate way to apply these regulations and concluded that it was improper to apply them at step two, and that Congress had intended that the consideration occur only after an impairment had already been found, at later stages of the sequential analysis, to result in a disability.

Here, as the foregoing analysis demonstrates, the ALJ was engaging in a different analysis. The ALJ was assessing the duration of various conditions and their effects in order to set forth his reasoning and to articulate required findings concerning the severity and duration of Plaintiff's various impairments. The ALJ was not engaging in a prohibited truncation of analysis with respect to conditions that were otherwise disabling.

Accordingly, the Court rejects Plaintiff's arguments concerning the ALJ's analysis at step two.

VIII. <u>Credibility Findings</u>

The ALJ found that although Plaintiff's medically determinable impairment could reasonably have been expected to produce the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms

were not credible to the extent that they were inconsistent with the RFC adopted by the ALJ. (A.R. 23.)

Plaintiff argues that the ALJ failed to state clear and convincing reasons for rejecting the extent of Plaintiff's subjective complaints of severe highs and lows, panic, anxiety, depression, and poor concentration.

### A. Legal Standards

It is established that unless there is affirmative evidence that the applicant is malingering, then where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which the applicant complains, an adverse credibility finding must be based on clear and convincing reasons. Carmickle v. Commissioner, Social Security Administration,, 533 F.3d 1155, 1160 (9th Cir. 2008). In Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007), the court summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" Morgan, 169 F.3d at 599 (quoting Lester, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." Id. Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." Id.

> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. See S.S.R. 02-1p (Cum. Ed.2002), available at Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, 67 Fed.Reg. 57,859-02 (Sept. 12, 2002); S.S.R.

25

96-7p (Cum. Ed.1996), available at 61 Fed.Reg. 34,483-01 (July 2, 1996). An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. See 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); see Daniels v. Apfel, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." Fair, 885 F.2d at 603; see also Thomas, 278 F.3d at 958-59.

Additional factors to be considered in weighing credibility include the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the person receives or has received for relief of the symptoms; any measures other than treatment the claimant uses or has used to relieve the symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529, 416.929; S.S.R. 96-7p.

B. The ALJ's Reasoning

The ALJ noted Plaintiff's inconsistent testimony concerning whether or not she had been using amphetamines or other illicit drugs at the time of the alleged onset date of disability, and her admission that she had worked for income from the state and during the 2005 Christmas season. (A.R. 22.) The ALJ also noted

26

Plaintiff's failure to provide any records or information that would enable procurement of records of treatment she allegedly received before her alleged onset date. (A.R. 24.)

Included in the factors that an ALJ may consider in weighing a claimant's credibility are the claimant's reputation for truthfulness; inconsistencies either in the claimant's testimony or between the claimant's testimony and the claimant's conduct, daily activities, or work record; and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). The ALJ may consider whether the Plaintiff's testimony is believable or not. Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999).

Here, the ALJ's reliance on the basic inconsistences in the evidence was supported by the record and was clear and convincing in force.

The ALJ detailed Plaintiff's testimony concerning inability to work because of being too emotional, financial problems, relationship problems, illness of a daughter, and identity theft. (A.R. 23.) The ALJ noted the allegations made in Plaintiff's application for benefits that work-like activities were precluded because of worsening depression, bipolar disorder, medications, stress, and having two disabled daughters. (A.R. 23, 97-98.) The ALJ noted Plaintiff's reported activities of daily living, including caring for her two young daughters and for her own personal needs, and performing household chores such as cooking meals with several courses. (A.R. 23, 116-17.) The ALJ mentioned Plaintiff's alleged difficulty sleeping, need for reminders for

medication and appointments, inability to go out alone due to side-effects of medications, report of becoming frustrated while driving, need for motivation to complete tasks, and memory and concentration difficulties. (A.R. 23, 117-20.) The ALJ also noted that on her appeal questionnaires, Plaintiff reported that her bipolar disorder was causing her to have severe highs and lows and to experience anxiety, panic, depression, fainting spells, and poor concentration, but she was still capable of caring for her own needs. (A.R. 23, 144-58, 144, 148, 151, 155.) The ALJ then stated his finding that Plaintiff's subjective complaints were incredible to the extent inconsistent with the RFC assessed by the ALJ. (A.R. 23.)

The ALJ then articulated various reasons for his findings. He stated that the record did not support a conclusion that Plaintiff had more than mild to moderate mental impairment symptoms since her alleged onset date, and most of those symptoms lasted no longer than a few days. (A.R. 24.) He noted that the medical records did not support her claim of having been too emotional to work and having difficulty leaving the house alone. (A.R. 24.) The ALJ noted the paucity of documentation of any episodes of severe limitation except during two very brief hospitalizations. (A.R. 23.) He referred to the substantial improvement noted by Dr. Birdlebough within a single week after Plaintiff's initial report, the course of marked improvement in all areas noted three months later, Plaintiff's own reports to her primary care physician in November 2004 that she had no significant complaints and felt better after starting treatment, and her appropriate appearance upon examination. (A.R. 23.) The

ALJ focused on the opinions of acceptable medical sources, such as Dr. Trivisonno, a psychiatrist (as contrasted with Joyce Ruff-Delgado, LMHC, who was not an acceptable medical source), and reviewed the longitudinal GAF scores, interpreting the evidence as reflecting severe symptoms that were only short-lived or subjectively based and thus overrated. (A.R. 23-24.) The ALJ noted that within months, Plaintiff improved to mild symptomatology, reaching a GAF of 70, indicating some mild symptoms and "if one point higher, would indicate that symptoms, if present at all, would be transient and expected reactions to psychosocial stressors with no more than sight impairment in social, occupational and school functioning." (A.R. 24.) The ALJ stated that most of the medical opinions regarding Plaintiff's functioning level indicated only mild symptoms, which would equate to generally functioning well. (A.R. 24.)

As the previous summary of the medical evidence reveals, this reasoning was supported by the record. Further, it was clear and convincing. Although the inconsistency of objective findings with subjective claims may not be the sole reason for rejecting subjective complaints of pain, Light v. Chater, 119 F.3d 789, 792 (9th Cir. 1997), it is one factor which may be considered with others, Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Morgan v. Commissioner 169 F.3d 595, 600 (9th Cir. 1999). Here, the ALJ's evaluation of Plaintiff's subjective claims found strong support in the medical record.

In rejecting Plaintiff's claim that she was too emotional to work and was having trouble leaving the house alone, the ALJ noted that Plaintiff had managed to maintain a home for her two

young children and care for them, including receiving payments from the state for care. (A.R. 24.) The ALJ also noted Plaintiff's report in April 2005 that she had applied and interviewed for positions. (A.R. 24.) A claimant's ability to engage in activities of daily living to the extent that he or she spends a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to the work setting is relevant; a specific finding as to this fact may be sufficient to discredit a claimant's allegations. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999); Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002). In Curry v. Sullivan, 925 F.2d 1127, 1130 (9th Cir. 1990), the court specifically concluded that an ability to take care of one's personal needs, prepare easy meals, do light housework, and shop for some groceries may be seen as inconsistent with the presence of a condition that would preclude all work activity (citing Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).

Here, in light of Plaintiff's long history of functioning sufficiently well to care for her disabled children and to collect income for her care-taking activities, the ALJ's reasoning was clear and convincing.

Accordingly, the Court concludes that the ALJ cited multiple, clear and convincing reasons for rejecting Plaintiff's subjective complaints regarding the intensity, duration, and limiting effects of her symptoms, and that the ALJ's reasons were properly supported by the record and sufficiently specific to allow this Court to conclude that the ALJ rejected the claimant's

testimony on permissible grounds and did not arbitrarily

discredit Plaintiff's testimony.

IX. <u>Lay Evidence</u>

Plaintiff argues that the ALJ failed to state specific

reasons germane to each witness in rejecting the statements of

Plaintiff's mother and stepfather.

The ALJ stated the following:

> In addition to the claimant's testimony and application
> and appeal statements, the record also contains the
> written questionnaires completed in November 2004 by
> the claimant's mother and stepfather. The claimant's
> mother, Lupe Martinez, stated that when the claimant
> first came to live with her, the claimant did not sleep
> but she was doing better. Mrs. Martinez stated the
> claimant had no problems caring for her personal needs or
> in taking care of her daughters' needs but she daily
> reminded the claimant to take her medications. She noted
> the claimant rarely left the home and never left alone.
> Specifically, she noted the claimant to be irritable, to
> have memory attention and concentration difficulties and
> to not handle stress or change well. The claimant's
> step-father, Raymond Ortiz, noted essentially the same
> observations as the claimant's mother. (Citation omitted.)

> The undersigned has carefully considered the statements
> from the claimant's mother and stepfather and give (sic)
> some weight relative to their account of their observations
> of the claimant but not to any conclusions reached from
> those observations because they were not provided by
> medically trained personnel; they are based on the
> claimant's subjective complaints; and they are in-
> consistent with the record as a whole.

(A.R. 24-25.)

Lay witnesses, such as friends or family members in a

position to observe a claimant's symptoms and daily activities,

are competent to testify to a claimant's condition; the

Commissioner will consider observations by non-medical sources as

to how an impairment affects a claimant's ability to work.

<u>Dodrill v. Shalala</u>, 12 F.3d 915, 918-19 (9th Cir. 1993). An ALJ

cannot discount testimony from lay witnesses without articulating

specific reasons for doing so that are germane to each witness.
Id. at 919. It is appropriate for an ALJ to rely on medical
evidence in rejecting inconsistent testimony. Lewis v. Apfel, 236
F.3d 503, 511-12 (9th Cir. 2001); Thomas v. Barnhart, 278 F.3d
947, 958-59 (9th Cir. 2002). It is permissible for an ALJ who has
rejected a claimant's subjective complaints to reject similar
evidence from third-party lay witnesses that is subject to the
same reasoning. Valentine v. Commissioner of the Soc. Sec.
Admin., 574 F.3d 685, 693-94 (9th Cir. 2009).

Here, the ALJ stated germane reasons concerning
inconsistency with the record as a whole and the evidence's being
based on the claimant's subjective complaints. The Court thus
rejects Plaintiff's challenges based on the ALJ's reasoning
concerning the lay evidence.

X. The ALJ's Reasoning concerning Dr. Kester's Opinion

The ALJ referred to Dr. Kester's opinion somewhat obliquely
in the course of addressing the medical opinion evidence. The ALJ
qualified and expressly gave significant weight to the opinions
of the treating psychiatrist and psychologist, Drs. Trivisonno
and Birdlebough, as qualified. (A.R. 25.) The ALJ concluded that
the import of the qualified opinions was that Plaintiff either
never had a serious functional limitation, or had such a
limitation for only a very limited time period. (A.R. 25.) The
ALJ then stated:

> The state agency medical consultant opinion was reasonable
> based on the available evidence at the time of the
> opinion and is thus given limited weight based on the
> medical evidence produced and received thereafter.

(A.R. 25.)

The Court notes that the ALJ had previously set forth the medical evidence in substantial detail and had recounted significant medical history, including that which arguably postdated Dr. Kester's opinion, including Plaintiff's marked improvement in all areas since starting on medication, Plaintiff's improving GAF assessments, Dr. Trivisonno's modified diagnosis, and Plaintiff's reports in April 2005 of being less depressed and having no manic, delusional, hallucinatory, or psychotic symptoms. (A.R. 18-20.) Thus, the ALJ in effect had noted that Plaintiff's symptoms had only improved after Dr. Kester rendered his opinion.

The Court further notes that in formulating Plaintiff's RFC, the ALJ's RFC closely tracked Dr. Kester's opinion of mild restriction in activities of daily living (A.R. 21, 318), moderate difficulties in social functioning that might cause difficulties with her ability to work closely with others (A.R. 21, 306), and moderate difficulties in concentration, persistence, or pace but an ability to perform uncomplicated tasks (A.R. 21, 318, 305-06). He also concluded that Plaintiff's depressive disorder would cause some problems in working closely with others and in performing more than simple, uncomplicated tasks on a regular basis. (A.R. 25, 305.)

Plaintiff argues that the ALJ rejected the limitations identified by Dr. Kester but failed to explain the weight given to Dr. Kester's opinion. However, as noted above, the ALJ largely adopted Dr. Kester's opinion and expressly gave it weight, but considered it qualified by the later medical evidence, which reflected improved symptoms. The ALJ articulated a specific,

33

legitimate reason for giving the opinion limited weight, namely, its reasonableness based on the other, contemporaneous medical evidence. Further, contrary to Plaintiff's assertion, the ALJ did point out inconsistencies between Dr. Kester's assessment and the later evidence, which reflected milder symptoms and signs.

The Court concludes that the ALJ's reasoning concerning Dr. Kester's opinion was adequately set forth.

XI. <u>Vocational Evidence at Step Five</u>

Plaintiff argues that the hypothetical to the VE omitted limitations that Dr. Kester had assessed with respect to concentration, persistence, and pace. The VE testified that there were jobs for one who could perform at least medium exertional work; understand, remember, and carry out simple, routine tasks; and should have only superficial interaction with the public and coworkers and probably be limited to working with only a few coworkers while working relatively independently, not cooperatively, with others. (A.R. 365-66.) However, when Plaintiff's counsel restated the limitations to include a "significant interference" with the ability to maintain attention and concentration for extended periods, carry out detailed instructions, work in coordination with or proximity to others without being distracted, and interact appropriately with the general public, the expert testified that such a person could not maintain competitive employment. (A.R. 367-68.) These "significant" limitations posited by Plaintiff's counsel were apparently based on Dr. Kester's assessments that Plaintiff was "Moderately Limited" in this regard. (A.R. 305-07.) Dr. Kester had marked "Moderately Limited," and the other choices of ratable

limitations were "Not Significantly Limited," and "Markedly
Limited." (A.R. 305-06, 368.) It thus appears that there were
multiple categories of limitations that were beyond
insignificant, but no category expressly labeled "Significant."

The VE testified that for one with the overall limitations
endorsed by Dr. Kester, there were jobs. Contrary to the
characterization of the opinion evidence set forth by Plaintiff's
counsel, Dr. Kester expressly qualified the checks in the boxes
by specifying further information in the section designed for
elaborations on the capacities after the summary conclusions had
been completed. (A.R. 307.) Dr. Kester stated that Plaintiff had
only "somewhat limited concentration" but had the ability to
perform simple, routine tasks routinely, and the ability to
persist daily and weekly. (A.R. 307.) He concluded that she might
be distracted until further stabilized on medication; she was not
precluded from working with others but rather would "work best"
with a limited number of coworkers performing relatively
independent tasks. (A.R. 307.) Any limitations were only
"moderate" at most. (A.R. 305-07.)

The Court notes that it has been held that a hypothetical
question concerning an expert's limitation to simple, routine or
repetitive tasks sufficiently captures even a moderate limitation
of concentration, persistence, or pace noted by the expert who
has opined that the claimant retains the ability to perform
simple, routine or repetitive tasks. Stubbs-Danielson v. Astrue,
539 F.3d 1169, 1173-75 (9th Cir. 2008).

Further, to the extent that medical evidence is
inconsistent, conflicting, or ambiguous, it is the responsibility

35

of the ALJ to resolve any conflicts and ambiguity. <u>Morgan v.</u> <u>Commissioner</u>, 169 F.3d 595, 603 (9th Cir. 1999). Because the ALJ has authority to interpret ambiguous medical opinions, <u>Matthews</u> <u>v. Shalala</u>, 10 F.3d 678, 680 (9th Cir. 1993), the Court must defer to the ALJ's decision.

Here, the ALJ appropriately interpreted the totality of Dr. Kester's opinion. The ALJ's hypothetical question included accurate statements of the limitations found by Dr. Kester and accepted by the ALJ. The Court concludes that the ALJ appropriately interpreted and weighed the medical evidence and concluded on the basis of substantial evidence that for one with Plaintiff's RFC and other attributes, sufficient jobs existed.

XII. <u>Disposition</u>

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on the application of correct legal standards.

Accordingly, the Court AFFIRMS the administrative decision of the Defendant Commissioner of Social Security and DENIES Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Alisa A. Martinez.

IT IS SO ORDERED.

**Dated:** __**February 19, 2010**__ _____**/s/ Gary S. Austin**_____
UNITED STATES MAGISTRATE JUDGE